## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                                                    No. CR 05-1485 MV

JOE CRUZ,

      Defendant.

### MEMORANDUM OPINION AND ORDER

This matter comes before the court on Defendant Joe Cruz's Motion to Suppress [Doc. No. 28] filed August 6, 2006.  The court, having considered the motion, briefs and relevant law, and having conducted hearings on this motion on November 17 and 21, 2006, and being otherwise fully informed, hereby **GRANTS** the Motion to Suppress.  This Memorandum Opinion sets forth the bases for the court's decision.

### I.  STATEMENT OF ISSUES

Defendant moves to suppress all physical evidence including the firearm and all statements allegedly made by him as "fruit of multiple Fourth Amendment violations."  Specifically, Defendant argues:  1) the initial traffic stop was not justified; 2) the weapons patdown was not supported by particularized suspicion that Defendant was dangerous; 3) the search of Defendant's wallet was without consent or probable cause; 4) the search of Defendant's vehicle was unlawful; and 5) all alleged statements made by Defendant are fruits of the officer's unlawful actions, and therefore must be suppressed.

## II.  STANDARD OF REVIEW

Preliminary questions concerning the admissibility of evidence are determined by the court. FED. R. EVID. 104(a) & 1101(d)(1).  In making its determination, this court is not bound by the rules of evidence, except those with respect to privileges.  *Id.*  Thus, the court may consider hearsay in ruling on a motion to suppress.  *See United States v. Merritt*, 695 F.2d 1263, 1269 (10th Cir. 1982).

The government bears the burden of proof, by a preponderance of the evidence, to justify warrantless searches and seizures.  *See United States v. Zubia-Melendez*, 263 F.3d 1155, 1160 (10th Cir. 2001) (citing *United States v. Matlock*, 415 U.S. 164, 177, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974)); *United States v. Maestas*, 2 F.3d 1485, 1491 (10th Cir. 1993).  Whether police conduct is reasonable under the Fourth Amendment is "measured in objective terms by examining the totality of the circumstances."  *Ohio v. Robinette*, 519 U.S. 33, 39, 117 S.Ct. 417,  136 L.Ed.2d 347 (1996).

## III.  FACTUAL BACKGROUND

The government and Defendant gave different accounts of the events that occurred the night of the arrest.  The government's version of events comes predominantly from the arresting officer, Officer Jose Carrasco, with additional testimony from Officer Shawn Hancock.  Notably, Officer Carrasco's testimony is so wrought with contradictions it makes it nearly impossible to glean facts from his testimony the court considers truthful.   It is also difficult to settle on just one scenario of facts on behalf of the government; therefore, the inconsistencies in Officer Carrasco's testimony are noted where relevant.  Defendant's version comes predominantly from the testimony of three witnesses, David Salinas, Trevor Westerman and Cecilio Diegues.  The court finds these witnesses to be more credible than Officer Carrasco.

A.      **Government's Version**

On January 12, 2005, Defendant was stopped in Albuquerque by Albuquerque Police Officer Jose Carrasco at approximately 1:00 a.m.  (Tr. at 25.)  Officer Carrasco was working that evening as a DWI saturation officer, primarily looking for individuals suspected of DWI.  (Tr. at 20, 65, 68, 69.)  In Officer Carrasco's supplemental report, he states he stopped Defendant because he swerved twice across the middle line of his lane with over half of his vehicle.  (Supp. Report at 2 of 4; *see also* Tr. at 20, 67.)  He also testified that when he saw Defendant's car swerve, it was a "clue of a DWI suspect."  (Tr. at 20, 65, 68.)  Officer Carrasco engaged his lights, signaling for Defendant to pull over.  (Tr. at 75.)  According to Officer Carrasco, Defendant continued driving approximately one block before pulling halfway into the driveway at 6808 Acoma Street, which was later determined to be Defendant's business and residence.  (Tr. at 20-21, 26.)  The drive was blocked by a gate.  (Tr. at 26.)  Officer Carrasco said he did not see anyone on the other side of the gate.  (Tr. at 334.)

Defendant was driving a 1997 gold Mercury station wagon.  (Supp. Report at 2 of 4.)  Upon approaching the driver's side of the vehicle, Officer Carrasco saw that the temporary license plate on the vehicle belonged to a 1993 blue Ford.  (Supp. Report at 2 of 4; *see also* Tr. at 21-22; Tr. G-Ex. 3.)  Officer Carrasco asked Defendant for his driver's license, insurance and registration.  (Tr. at 22.)  According to Officer Carrasco, Defendant said he did not have his license with him, but gave his correct personal information.  (Tr. at 22-23, 284; Supp. Report at 2 of 4.)  Defendant also did not have the registration or insurance for the vehicle, but informed Officer Carrasco it belonged to his car lot and was insured through his business.  (Tr. at 22-23; Supp. Report at 2 of 4.)  Officer Carrasco described Defendant as having "droopy, blood-shot eyes" and "slurred speech."  (Tr. at 38-39.)  Nevertheless, Officer Carrasco did not ask Defendant whether he was under the influence of alcohol

3

or drugs, or conduct any type of DWI investigation at that time.  (Tr. at 69; *see also* Tr. at 39, 67, 70.)

There were two passengers in Defendant's car at the time of the stop; Trevor Westerman was in the front passenger seat and David Salinas was in the back seat.  (Tr. at 23.)  According to Officer Carrasco, Westerman and Salinas were "moving around" and "hiding their hands between their legs." (Tr. at 23-24.)  Officer Carrasco instructed Westerman and Salinas respectively to place their hands on the dashboard and headrest in front of them.  (Tr. at 24.)  While Officer Carrasco was obtaining Defendant's personal information, he said he observed Westerman and Salinas moving around again and hiding their hands.  (Tr. at 24.)  Officer Carrasco said he instructed Westerman and Salinas to place their hands where he told them, and asked each of them if they had a New Mexico driver's license or I.D., to which they both responded no.  (Tr. at 24; *see also* Tr. at 291.)  Officer Carrasco then asked Westerman and Salinas for their personal information as a safety measure.  (Tr. at 24, 93-94.)  Officer Carrasco's police report states that Westerman gave his correct information and Salinas initially gave the false name "Timmy Salinas."  (Supp. Report at 2 of 4.)

According to Officer Carrasco, after obtaining the personal information for Defendant, Westerman and Salinas, he walked back to his patrol car and ran all three of their names through the N.C.I.C. system.  (Tr. at 29.)  Defendant's license came back as valid, and he had no warrants.  (Tr. at 86, 285.)  No information came back for Westerman or Salinas, so Officer Carrasco called for back-up;[1] and then asked them again for their "real names and dates of birth."  (Supp. Report at 2 of

---

[1] Officer Carrasco testified he called for back-up from his patrol car after running the names through N.C.I.C. and not receiving any information on the passengers.  (Tr. at 29, 106.)  Yet later, he testified that he called for back-up on his hand-held radio while walking back to his patrol car before running the names.  (Tr. at 291-292.)

4; *see also* Tr. at 29, 106.)  At that time, Officer Carrasco admitted that he did not have any reasonable suspicion that Westerman or Salinas had committed a crime.  (Tr. at 103-104.)  When asked if anything suspicious was happening, Officer Carrasco testified:  "No.  The only suspicion I had, ma'am was concealing identity.  That's it."[2]  (Tr. at 108.)  When asked if he still suspected DWI, he responded "[n]ot really, ma'am, because of the– I couldn't smell no alcohol.  I mean there was a slight suspicion of DWI, but my focus wasn't on DWI.  My focus was just an entire thing, making the scene secure and moving forward from there."  (Tr. at 108.)

According to Officer Carrasco, Officer Shawn Hancock was the only officer that responded to the call for back-up.  (Tr. at 29; s*ee also* Tr. at 187-188, 192, 344.)  When Officer Hancock arrived, he approached Westerman on the passenger side of the vehicle.  (Tr. at 187.)  Officer Hancock testified he asked Westerman for his name and identification.  (Tr. at 191.)  He said Westerman gave his name, Trevor, and produced a false I.D. with the name "Tom Metcalf."  (Tr. at 191.)  Officer Hancock said that once he gave one name and produced an I.D. with another, he removed Westerman from the car, patted him down for weapons, handcuffed him and placed him on the curb.  (Tr. at 191, 193.)  No weapons were found.  (Tr. at 205.)  However, subsequently, Officer Hancock testified that Westerman did not give him the false I.D. until *after* he had removed Westerman from the vehicle and patted him down (Tr. at 204); thus contradicting his alleged reason for removing Westerman from the vehicle.  Although Westerman was handcuffed, Officer Hancock testified he was not under arrest at that point, but being detained for further investigation.  (Tr. at 193.)  According to the police report, Westerman was arrested for concealing his identity.  Officer

---

[2] This testimony is not consistent with Officer Carrasco's later testimony in which he said the passengers' movements made him fear they were going to draw a weapon or possibly turn around and shoot him.  (Tr. at 288.)

Hancock testified that he then searched Westerman incident to arrest.  (Tr. at 214.)  He said he found a plastic container holding two, small baggies of a white powdery substance and another small baggie of a black gummy substance, which the police report says Officer Carrasco field tested as methamphetamine and heroin.  (*See* Tr. at 215.)

Officer Hancock testified that he had no contact with Defendant or Salinas.  (Tr. at 216.)  After dealing with Westerman, he said he was merely the "cover officer" and his job was to watch Defendant, Westerman and Salinas on the curb while Officer Carrasco ran I.D. checks and searched the vehicle.  (Tr. at 194, 213, 216.)  He also said he did not remember any other individuals or civilians being there, nor anyone coming to the gate.  (Tr. at 194-195.)

While Officer Hancock investigated Westerman, Officer Carrasco removed Salinas from the vehicle and asked him to step to the rear of the vehicle for additional questioning.  (Tr. at 30.)  He said at that point, Salinas gave his correct name, David Salinas, and date of birth.  (Tr. at 30-31.)  He ran the information through N.C.I.C. and discovered Salinas had a misdemeanor warrant for his arrest.  He said he "placed him under arrest for the warrant, and handcuffed him and began a search."[3] (Tr. at 31.)  Officer Carrasco found no weapons or contraband on Salinas.  (Tr. at 99, 101.)

According to Officer Carrasco, Defendant remained seated in the driver's seat of the vehicle while Officer Carrasco ran the names through N.C.I.C., and while Westerman and Salinas were being interrogated and arrested.  (Tr. at 91, 106.)  Officer Carrasco said Defendant was not moving around when he initially questioned him or while he was running the names through N.C.I.C.  (Tr. at 91,

---

[3] Later, Officer Carrasco testified that he patted down Salinas before questioning him about his identity. (Tr. at 109-110.)  Additionally, he later testified that Salinas told Officer Carrasco he had a warrant before discovering it through N.C.I.C.  (Tr. at 109.)  Neither of these subsequent statements are confirmed in his police report.  (*See* Supp. Report at 2 of 4.)  Furthermore, the report says Salinas was arrested for concealing his identity, not based on the warrant.  (*Compare* Supp. Report at 2 of 4 *with* Tr. at 31.)

106.)  However, he said Defendant started moving around while he was questioning Salinas.  (Tr. at 111-112.)  According to the police report, Officer Carrasco said he saw Defendant move his seat back and appear to hide something in the center console of the vehicle.[4]  (Supp. Report at 2 of 4; *see also* Tr. at 32.)  Officer Carrasco said he told Defendant to stop moving around, and he stopped.  (Tr. at 115,117.)

After Officer Carrasco completed his interrogation and arrest of Salinas, approximately ten to 15 minutes after the initial stop, he approached Defendant and asked him to exit the vehicle.  (Tr. at 53, 116-117, 119, 123.)  Up until that point, Officer Carrasco testified that Defendant had not been uncooperative or belligerent.  (Tr. at 123.)  Even after testifying that Defendant was moving around in the car while he was arresting Salinas, Officer Carrasco said he was not worried that he would get shot because Defendant "was not turning around after [Officer Carrasco] told him to stop."[5]  (Tr. at 117; *contra* Tr. at 120.)  Nevertheless, Officer Carrasco had Defendant walk to the rear of the vehicle, where he patted him down.  (Tr. at 32.)  While patting him down, Officer Carrasco testified he "felt a wallet [in Defendant's back pocket] and asked him what it was."  (Tr. at 33.)  Defendant responded it was a wallet.[6]  (Tr. at 33; *but see* Tr. at 121.)  Officer Carrasco then asked him if he could take it out, and Defendant allegedly responded yes.  (Tr. at 33.)  Officer Carrasco testified that while holding Defendant with one hand, he removed the wallet with his other hand and dropped it to

---

[4] Later when describing Defendant's alleged movement, Officer Carrasco omitted any reference to the center console and instead said Defendant was "looking back and then moving around– he also moved back towards the back seat. . .".  (Tr. at 115.)

[5] Later Officer Carrasco testified to the contrary saying he patted Defendant down because he had a "suspicion or fear that he had some kind of firearm or weapon on his person."  (Tr. at 120.)

[6] Officer Carrasco testified later that he could clearly see the item was a wallet because it was halfway out of Defendant's pocket; thus undermining his purported need to ask Defendant what it was.  (Tr. at 121.)  This new assertion is not confirmed in his police report.  *(See generally* Supp. Report.)*

the ground.  (Tr. at 34, 122-123.)  According to the police report, when the wallet hit the ground,

it fell open, and Officer Carrasco was able to see a New Mexico Identification Card in it.  (Supp.

Report at 2 of 4.)

Officer Carrasco testified that he could clearly see the picture on the I.D. was that of

Defendant from where he was standing, despite the fact that he also described the scene as dark.[7]

(Tr. at 34, 124-125, 335; *see also* Tr. D-9.)  The police report states that Officer Carrasco "then

pulled the I.D. card from [Defendant's] wallet and saw that it had his picture on it, but with the name

of Patrick Tafoya on it."  (Supp. Report at 2 of 4; *but see* Tr. at 298.)  Officer Carrasco observed that

the I.D. appeared to be fake and stated Defendant's weight as 1652 pounds.  (Supp. Report at 2 of

4.)  According to the police report, Officer Carrasco then "placed [Defendant] under arrest for

Altering an Identification card, handcuffed him and searched him incident to an arrest."  (Supp.

Report at 2 of 4; *see also* Tr. at 302; *but see* Tr. at 298.)  However, Officer Carrasco's testimony on

this critical point varies considerably.[8]

---

[7]  Officer Carrasco alternately described the scene as dark when describing his concern for his safety (Tr. 25-26; *see also* Tr. at 334-335), and then well-lit when describing his ability to see details on the identification card.  (Tr. at 37; *see also* Tr. at 124-125, 301-302.)

[8]  On the first day of the suppression hearing, he testified that after dropping the wallet to the ground, he removed Defendant's I.D., then placed him under arrest for concealing identity.  (Tr. at 34-35.)

On the second day of the suppression hearing, he initially testified that he placed Defendant under arrest *after* removing the I.D. from the wallet; but then "corrected" himself and said he placed Defendant under arrest *before* removing the I.D.  (Tr. at 298.)  Yet on cross-examination, he flipped again by stating he pulled the I.D. card out of the wallet *after* arresting Defendant.  (Tr. at 301.)

Finally, at Defendant's state court bond hearing on March 4, 2005, less than two months after the incident, he testified wholly inconsistently when stating:

[A]fter I got. . . the vehicle, and I was tying [sic] them down, I saw a checkbook in the back of his pocket, and I took it out, because I was patting him down for weapons, and to make sure he didn't have anything, because I was going to handcuff him, *because he was already placed under arrest*.  I put the checkbook down and actually threw it down on the ground, and when it hit the ground, it opened up, and I saw I.D. card in there.  He had told me that he didn't have an I.D.

The police report says that during Officer Carrasco's search of Defendant he "found a check made out to Footlocker from Patrick Tafoya." (Supp. Report at 2 of 4.) The report also says Officer Carrasco "asked Cruz why he had Patrick Tafoya's check, which he said 'I just needed some shoes.' I [Officer Carrasco] then advised Cruz of his Constitutional rights (which he said he understood)." (Supp. Report at 2 of 4; *see also* Tr. at 36.) Furthermore, according to the report Officer Carrasco found on Defendant a brown leather checkbook with two additional checks for Patrick Tafoya, two $20.00 bills and one $100.00 bill that appeared to be counterfeit. (Supp. Report at 2 of 4; *see also* Tr. at 36.) Finally, Officer Carrasco testified he also found in Defendant's possession a series of checks for "Metcalf" and "Tafoya" and "I.D. cards matching the names. But it was Westerman's picture on it." (Tr. at 36.) Officer Carrasco testified that it was the same fake I.D. Defendant had, just with Westerman's picture on it.[9] (Tr. at 36.) Officer Carrasco then had Defendant sit on the curb with Westerman and Salinas while he searched the vehicle. (Tr. at 37.)

Officer Carrasco testified that once he makes an arrest it is his standard operating procedure to conduct an inventory search of the vehicle. (Tr. at 43.) He said the reason for doing an inventory search is to make sure nothing gets taken to protect the department and the defendant. (Tr. at 42.) He said he also does an inventory search as a "safety checker" because he does not want to leave a

---

> card, so I, when I saw I.D. card. . . I handcuffed him for officer safety and sat him down on the curb. And I looked at the I.D. card, and the I.D. card had David (Inaudible), same as the, the I.D. card the other person had, except that it had his picture on it.

(Tr. Ex. D-6 at 21-22 (emphasis added.))

[9] The police report does not corroborate Officer Carrasco's testimony regarding finding an I.D. for Westerman in Defendant's possession or any checks for "Metcalf" which is where this information would be expected to be recorded, especially because the other items allegedly found on Defendant were listed there. (Supp. Report at 2 of 4.) Furthermore, this testimony directly contradicts his subsequent testimony and Officer Hancock's testimony in which they both said Officer Hancock gave Officer Carrasco the false I.D. he obtained from Westerman bearing Westerman's picture and the name "Patrick Tafoya." (Tr. at 114, 210, 298.)

vehicle in its location with a "loaded handgun or narcotics" where the public might be able to break in and take either of them. (Tr. at 42; *see also* Tr. at 332.) Officer Carrasco testified "[i]f a vehicle pulls into a residence, by SOP, we're not supposed to tow it. However, the way the vehicle was stopped, halfway in, halfway out of the street, it would have been a traffic hazard. . .". (Tr. at 42; *see also* Tr. at 334.) Therefore, even though Defendant told Officer Carrasco that he lived at the address where the car was parked, Officer Carrasco stated he "had no way of knowing if it was his residence or it wasn't his residence" since Defendant "gave [him] two different names. . . so [he] just took it at face value, and towed the vehicle." (Tr. at 41.)

During Officer Carrasco's search of the vehicle, he opened the center console and found a loaded Keltech .32 caliber handgun with a round in the chamber. (Supp. Report at 2 of 4; Tr. at 38.) The police report states he also found a syringe, two measuring spoons, a box containing 249 red Sudafed pills and another box containing over 350 white SU-24 [Sudafed] pills. (Supp. Report at 2 of 4; *see also* Tr. at 40.) Additionally, Officer Carrasco found "an eyeglass case which contained 77 white pills with the Letter and numbers L054." (Supp. Report at 2 of 4; *see also* Tr. at 40.) Finally, Officer Carrasco's report says he found "a brown leather checkbook, which contained a New Mexico Identification card with the name of Patrick Tafoya but had Westerman's picture on it. . . [and] in the checkbook were eight MBNA bank checks with Tom Metcalf's name on them. One of the checks (#1012) was made out to Radio Shack in the amount of $2554.06 and was signed 'Tom Metcalf.'" (Supp. Report at 2 of 4; *but see* Tr. at 114, 210, 298.) Notably, the vehicle is the third location from which Officer Carrasco allegedly obtained Westerman's false I.D. bearing the name "Patrick Tafoya." (*Compare* Supp. Report at 2 of 4 (found I.D. on Defendant) *with* Tr. at 210, 298 (obtained I.D. from Officer Hancock) *and* Supp. Report at 2 of 4 (found I.D. in vehicle).)

10

After completing his search of the vehicle, Officer Carrasco testified that he asked Defendant who owned the gun; and Defendant did not respond.[10]  (Tr. at 40-41.)  Then, based upon the Sudafed found in the vehicle, he asked Defendant "if he was making meth, were those used to make meth?" (Tr. at 40.)  Officer Carrasco said Defendant "nodded his head up and down, meaning yes."[11]  (Tr. at 40; *see also* Supp. Report at 2 of 4; *but see* Tr. D-6 at 26.)  Additionally, Officer Carrasco testified he asked Defendant if he had been drinking; and Defendant said no.  (Tr. at 39.)  He then allegedly asked Defendant if he "was taking any type of drugs" and Defendant admitted using heroin.  (Tr. at 39.)

Officer Carrasco conducted no further DWI investigation of Defendant.  He gave two different reasons for not doing so.  First, Officer Carrasco testified:

> At the time I was not a drug recognition expert, which is a DRE, so I was not really familiar with signs of intoxication, or signs of impairment due to drugs.  So, I did not conduct a– a DWI investigation, because I was– I wasn't a DRE officer, so I didn't know the– the procedures of going– investigating a person suspected of DWI or drugs.[12]

---

[10]  At the state court bond hearing, Officer Carrasco testified he recorded the events at the scene with a belt tape.  (Tr. Ex. D-6 at 30.)  He testified Defendant's admission that the gun was his was recorded on his belt tape.  (Tr. Ex. D-6 at 29-30.)  However, later at the suppression hearing, he again "corrected" himself and said the belt tape did *not* record Defendant's alleged admission because the admission was made at the jail when the belt tape was no longer recording.  (Tr. at 51-52.)  Furthermore, when the court asked for the production of the belt tape, Officer Carrasco testified that he could not find it.

[11]  Officer Carrasco testified inconsistently at the state court bond hearing.  At the bond hearing, he testified Defendant actually said he used the pills to make meth, and did not just nod his head.  Specifically, Officer Carrasco said: "[a]s far as the pills.  He said, he didn't say that it was for meth.  I like, I asked him, 'Did you use it for making meth?'  He shook his head, and he said, 'Yeah.'  I mean, I asked him, 'Is it for meth?'  And at that time, he said 'no.'  But he had said 'yes' when I initially asked him about it."  (Tr. D-6 at 26.)

[12]  When questioned further about his DWI training at the police academy, Officer Carrasco said, "[w]hen I went through academy, ma'am, they did not tell us anything. . . [w]hen I went through it, they advised us of instances of people driving under the influence, and then they said you have to call a DRE officer to do investigation."  (Tr. at 83.)  However, when subsequently asked if he could have called a DRE officer that night, Officer Carrasco responded to the contrary "I did not know at the time, ma'am, that I could have called for a DRE. . .".  (Tr. at 85.)

(Tr. at 39; *see also* Tr. at 68, 72; *but see* Tr. at 65 (Officer Carrasco admitted having the ability to conduct a field sobriety test.)   Given that Officer Carrasco was working that night as a DWI saturation officer (Tr. at 20, 65, 68), whose primary function was to look for DWI suspects (Tr. at 69), which he admitted includes persons suspected of using both alcohol and drugs (Tr. at 66), it is inconceivable that Officer Carrasco did not know how to conduct a DWI investigation.   Moreover, his purported lack of experience is inconsistent with the following testimony concerning his prior experience conducting DWI investigations:

> Q.      Had you ever done a DWI investigation or been on DWI duty prior to January 12th of last year?
>
> A.      Yes.
>
> Q.      Can you give us an estimate of how many times of what it would be if it was combined a week, a month.
>
> A.      Going back to prior to me joining the Albuquerque Police Department, ma'am.  I was in the military, the latter part of my career, I would say about four, four and a half years I was a military police officer.  I did over 500 DWI investigations in the military.  Not all of them ending up in arrest.  And once I went to the department, up to that point, on the day in question, I would say maybe– I had maybe done 100, maybe, DWI investigations, as a sworn police officer.

(Tr. at 84.)   It is highly improbable that during the course of over 600 DWI investigations, Officer Carrasco never came across a person suspected of being under the influence of drugs, as opposed to alcohol.[13]

---

[13] Officer Carrasco's testimony is also inconsistent with the following testimony at the state court bond hearing in which he was qualified as an expert on the production of methamphetamine:

> MS. LOVATO-YOUNG:  Detective Carrasco, why don't you go into your experience about, I guess, drug testing and drug recognition?
>
> DET. CARRASCO:  Okay, well I was in the military nine and a half years.  The last five years of my military career, I did Military Police, and I came in contact, and I was also trained in, detecting methamphetamine, cocaine, marijuana and heroine [sic], all different types of drugs.

Second, Officer Carrasco testified that he did not conduct a field sobriety test of Defendant at the time of the stop because he "did not feel safe." (Tr. at 68.) He said "other events led [him] to getting the individual out of the vehicle and getting [his] focus away from DWI."[14] (Tr. at 67.) He explained "before I can conduct any type of DWI investigation, ma'am, that's when the people were hiding, being evasive, so, I am not going to conduct a DWI investigation until I feel safe. My safety is priority." (Tr. at 68; *see also* Tr. at 287.)

However, although Officer Carrasco testified that Westerman and Salinas were moving around at first, he said they "weren't moving around or anything" when he was checking their names on N.C.I.C., and said nothing suspicious happened between that time and when back-up arrived. (Tr. at 106, 108.) Moreover, Defendant's conduct did not contribute to Officer Carrasco's initial alleged safety concern. In fact, Officer Carrasco did not remove Defendant from the vehicle until ten to 15 minutes after the initial stop (Tr. at 53, 119, 123), thus undermining any alleged safety concern with respect to Defendant. After back-up arrived, Officer Carrasco clearly could have conducted a DWI investigation of Defendant, but did not. Officer Carrasco admitted nothing prevented him from conducting a sobriety test once backup arrived, he "just forgot" about it until after Defendant was under arrest. (Tr. at 287.) He then questionably stated that he did not conduct a field sobriety test after arresting Defendant because he did not want to "violate his rights by uncuffing him to do field

---

Also, at the Police Academy, we actually had hands-on training on methamphetamine, crack cocaine, heroine [sic], black tar heroine [sic] and marijuana. This is all the types of illegal narcotics. Also, we were also trained and also through my field experience, have knowledge of the syringes, measuring spoons, bigger spoons, they are heated, they are black. You can tell that they have been used for either doing narcotics, ingesting narcotics or manufacturing of narcotics.

(Tr. D-6 at 17-18.)

[14] This statement suggests Officer Carrasco was capable of conducting a DWI investigation, which is inconsistent with his claim that he was not trained to conduct such an investigation.

sobriety tests, after he told me he is under the influence of heroin, and then rearresting him, if you will, and rehandcuffing him for another charge." (Tr. at 71-72; *see also* Tr. at 287.)

After completing his search of the vehicle, Officer Carrasco had it towed from Defendant's driveway (Tr. at 41) and transported Defendant, Westerman and Salinas to the west side substation for further questioning. (Supp. Report at 2 of 4; Tr. at 39-40.) Officer Carrasco testified everyone was quiet on the way to the substation. (Tr. at 43.) Once they arrived at the substation, he put them in a room, and then brought them into his office one by one for questioning. (Tr. at 43.) He said he questioned Defendant first. (Tr. at 44.) He asked him about the Sudafed, the gun, the checks, the licenses and the I.D. cards; however Defendant was "uncooperative and refused to talk to [Officer Carrasco.]" (Tr. at 44.) At that point, he said he escorted Defendant back to where the other persons were and then brought in Salinas for questioning. (Tr. at 44.)

Officer Carrasco questioned Westerman last. (Tr. at 44.) He said Westerman was "very uncooperative, being belligerent, calling me names." (Tr. at 44.) While he was talking to Westerman, another officer took Defendant to the restroom. (Tr. at 45.) On his way back from the restroom, Officer Carrasco said he told the officer to bring Defendant into his office because he was going to take him to jail. (Tr. at 45.) At that point, Officer Carrasco said Defendant "just took over where Westerman left off" being belligerent without any prompting or questions from Officer Carrasco. (Tr. at 45.) He paraphrased Defendant as saying:

> I was probably proud of myself, because it was my biggest bust, he said he's been caught for altering weapons before. He's done time for bigger stuff than this. It was his gun, it was his drugs, that "You charge me with everything. I guarantee you I'll get out before you even get home." Just stuff like that.

(Tr. at 46; *see also* Supp. Report at 1 of 1.) At this time, Officer Carrasco said he was typing

14

Westerman's information in his report, so he just started typing exactly what Defendant was saying. (Tr. at 47.)  When he was finished, Officer Carrasco said he cut and paste Defendant's statement and moved it down in his report so it made sense.[15]  (Tr. at 47.)  When asked why he did not include Defendant's alleged admission in Defendant's criminal complaint, which contains the same information as is in the original police report (Tr. at 303), Officer Carrasco unconvincingly said Defendant's "paperwork was already completely done" and printed.  (Tr. at 306-307.)  Despite acknowledging that an admission such as that allegedly made by Defendant is important (Tr. at 303), and that he could have added this important information to Defendant's complaint, he just simply did not do it.  (Tr. at 307.)  This explanation is incredible, especially in light of the standard protocol Officer Carrasco consistently described himself as following.

Officer Carrasco then testified he "tag[ged] all the evidence [he] had" when he got to the substation.  (Tr. at 41.)  Furthermore, upon review of the standard operating procedures for evidence tags, Officer Carrasco admitted he is required to tag all evidence seized pursuant to an arrest, including the gun, ammunition, counterfeit money, pills, I.D.'s, checks, and belt tapes in certain instances.  (Tr. at 313, 314-315, 323; Tr. D-3; Tr. D-7.)  However, Officer Carrasco did not tag the gun, ammunition, counterfeit money, temporary license plate or belt tape into evidence.[16]  (Tr. at 316,

---

[15] Later, on cross-examination, Officer Carrasco said he was in the middle of typing the criminal complaint for Westerman, not the report, when he started typing Defendant's alleged statement.  (Tr. at 306.)  This time, he said he cut and paste, but "[o]pened up a new document, new supplemental report, and pasted it on there."  (Tr. at 306.)

[16] Officer Carrasco's testimony regarding the alleged belt tape is inconsistent.  At the bond hearing, he said he tagged it into evidence. (Tr. D-6 at 30; see also Tr. at 326-327.)  However, this is not indicated in his report (Tr. D-6 at 30), nor is there an evidence tag for it.  (Tr. at 327.)  At the suppression hearing, Officer Carrasco said he thought he tagged it, but did not.  (Tr. at 323.)  However, he subsequently changed his position and said he knows he tagged it.  (Tr. at 327.)

Officer Carrasco also said he is not required to tag the belt tape into evidence, but he still "let[s] it known to other people, to the attorneys, whoever, that there is a belt tape, via verbal or on my. . . report, belt tape not tagged, audio.  Something to that effect.  Letting everybody know that there is audio of the incident."  (Tr. at 310.)

327; *see also* Tr. at 323.)  Additionally, the evidence allegedly found in Westerman's possession, e.g.,

the drugs and I.D. card, was placed in evidence under Defendant's name.  (Tr. at 317.)  Furthermore,

the evidence that was tagged into evidence was subsequently destroyed pursuant to an instruction

from the district attorney.  (Tr. G-1.)

Regarding the counterfeit money, Officer Carrasco testified that he contacted the evidence

department and he was told to contact Secret Service.  (Tr. at 321-322.)  He said he then contacted

Secret Service and they inexplicably told him *not* to tag the money into evidence (despite Rule 2-08-8

requiring him to do so (Tr. D-7)), but instead to keep it until the criminal proceeding is done and then

they would take it over.[17]  (Tr. at 321-322; *but see* Tr. D-7 at 2-08-8 (requiring money to be tagged.))

He then said he told the district attorney what Secret Service had told him to do, and "they said okay,

just hang onto it" so he kept it in his file.  (Tr. at 322.)  Additionally, Officer Carrasco testified he

contacted ATF (Alcohol Tobacco and Firearms) that night and was instructed *not* to tag the gun, but

to turn it over to them.  (Tr. at 324.)  However, he said ATF never picked up the gun.  (Tr. at 325.)

Finally, after Defendant was finished at the substation, the police report indicates he was

transported with Salinas and Westerman to the Metropolitan Detention Center where they were

booked on the "listed charges."  (Supp. Report at 2 of 4.)

**B.    Defendant's Version**

**1.    Salinas and Westerman Testimony**

---

In these instances, he testified he kept the belt tapes in his desk when he was a detective, and now keeps them at his home.  (Tr. at 310.)  There is no indication that he notified anyone about having the belt tape in his possession. The alleged belt tape has never been found or produced (Tr. at 311); and the court questions whether it ever existed.

[17] At the bond hearing, Officer Carrasco testified the district attorney, not Secret Service, told him not to tag the counterfeit money into evidence, but instead to hang onto in and they would pick it up.  (Tr. at 321.)

Defense witnesses describe a much more oppressive version of events occurring on January 12, 2005.  Both Salinas and Westerman testified Defendant swerved before he was pulled over.  (Tr. at 140, 234.)  Salinas said Defendant stopped at his shop and tried to pull into the gate, but it was closed (Tr. at 130, 144) so he pulled onto the curb.  (Tr. at 130.)  He described the car as being "partially off the street and partially in the street."  (Tr. at 144.)  He said he remembers seeing a mechanic coming from the shop who "waved the keys like he was going to open up the gate for us." (Tr. at 131.)  However, "[t]hey [the police] told him to get his ass. . . back into the house" and to "back away from the gate."  (Tr. at 149.)  Westerman remembered the gate was closed but did not remember seeing anyone standing there.  (Tr. at 277-278.)

After stopping the car, Westerman and Salinas both testified that an officer approached the vehicle and asked Defendant for his license and registration.  (Tr. at 143, 235-236.)  They also both remember Defendant giving his correct name (Tr. at 143) and information (Tr. at 235-236.)  The officer asked Salinas who he was and Salinas testified he "lied and said  I was my brother Timmy" because he was "freaking out."  (Tr. at 133; 141-142; *see also* Tr. at 235-236.)  Westerman said he gave the officer his correct name, date of birth and social security number, but did not have a valid New Mexico drivers license or identification card at that time.  (Tr. at 236.)  Westerman also said he remembered the officer saying it was "DWI saturation night, and he pulled [them] over for suspected DWI."  (Tr. at 236-237.)

Salinas and Westerman both testified numerous police cars and officers were at the scene that night.  (Tr. at 131-132, 237.)  Salinas testified that four marked patrol cars arrived immediately after Officer Carrasco, with about six officers.  (Tr. at 131-132.)  Westerman testified that five police cars arrived at the scene with about eight uniformed police officers.  (Tr. at 237; *see also* Tr. at 242.)

17

Salinas described them as arriving almost immediately after they were stopped (Tr. at 131-132); while Westerman said they arrived after the officer ran their names and presumably called for back-up.  (Tr. at 237.)  Additionally, Salinas testified four to five police officers surrounded the vehicle, all with their firearms drawn, including the officer who approached the vehicle.  (Tr. at 132-133.)  Westerman said he did not try to hide anything while he was in the car because he couldn't; but admitted he may have been moving because he was high on speed.  (Tr. at 246.)

Salinas testified that he initially lied to the officer and gave the name "Timmy."  (Tr. at 133.)  He said after he gave this name, he was pulled out of the car and handcuffed.  (Tr. at 132-133, 142.)  He said later, while seated on the curb, the officer "basically figured out [he was lying] when he asked me my Social Security.  And I don't know my brother's Social Security, so I kind of stumbled on it, and by that time I was so cold, I was just like okay, I'm sorry, I lied.  And I apologized to him and everything."  (Tr. at 142-143; *see also* Tr. at 135.)  He then gave him his correct name.  (Tr. at 135.)  When asked if he gave a false name because he had an outstanding warrant, he said no because he did not know he had a warrant.  (Tr. at 141-142; *see also* Tr. at 133-134.)  He also said he was not patted down or searched before he was handcuffed.  (Tr. at 134, 135.)  He said none of them were placed under arrest or read their rights before they were handcuffed.  (Tr. at 148.)  After being handcuffed, he was sat on the curb.  (Tr. at  132.)

Westerman testified he was pulled out of the vehicle through the car window by a "large white male" officer.[18]  (Tr. at 237, 270-271.)  He said the officer told him he was concealing his identity, grabbed him, pulled him out and then searched him.  (Tr. at 271.)  He said the officer "reached into

---

[18]  Westerman's description of the officer who allegedly pulled him out of the car matches the description of Officer Hancock.  (*Compare* Tr. at 270-271 (describing officer as 6'1", 235 pounds) *with* Tr. at 207-208 (Officer Hancock describing himself as 6'1", 230 pounds.))

18

[his] black leather jacket and pulled out a small– probably one inch by one inch medicine case, that contained heroin and speed in it.  And on my inside jacket pocket, he pulled out a 10-pack of 1 cc insulin syringes." (Tr. at 237-238.)  Without consent, the officer opened the container, pulled out the drugs and said "you know what this is?" (Tr. at 238.)  He said the officer then handcuffed him and sat him on the curb. (Tr. at 238.)  He also said he had two checkbooks and two I.D.'s with the names "Patrick Tafoya" and "Tom Metcalf" in his pocket with the syringes that the officer removed. (Tr. at 239-240.)  He said he did not give these I.D.'s to the officer. (Tr. at 240.)  He said the officer stopped searching him after finding the drugs and the checkbooks, despite the fact that he still had a knife in his pocket that he used to "scrape baggies." (Tr. at 241, 257.)

Westerman also said he saw Defendant being brought out of the car and searched. (Tr. at 238.)  He said the officer found a driver's license on him and that was it. (Tr. at 238, 239.)  Defendant was handcuffed and sat on the curb next to Westerman. (Tr. at 238.)  Both Salinas and Westerman testified they sat on the curb for approximately an hour while the officers searched the vehicle. (Tr. at 132, 148, 239, 241.)

Salinas and Westerman both admitted they were high on methamphetamine that night. (Tr. at 139, 248.)  Salinas said "[w]e were all pretty high." (Tr. at 139.)  He said he "never saw [Defendant] do it exactly, but by the way he was acting, I could tell that he was high." (Tr. at 140.)  Salinas initially said Defendant was high on meth, but then said it may have been heroin since he "was too tired to be high on meth." (Tr. at 139.)  Salinas said he did not remember hearing Defendant tell an officer he was on heroin. (Tr. at 144.)  He also said he did not know Sudafed was in the car until the officer pulled it out and threw it on the hood. (Tr. at 143-144.)  He did not see any I.D.'s and did not hear Westerman say anything. (Tr. at 143.)

Westerman said he had been using methamphetamine every day around that time, including the day of the arrest. (Tr. at 248.) He also admitted it had been a long time since he slept prior to that night because of the meth. (Tr. at 249.) Earlier that day, Westerman said he "fell out" and "had been so high for so long that [his] body couldn't take it anymore, and [he] fell asleep" for two to three hours. (Tr. at 250.) Before that day, he said he had been up for days, maybe a week. (Tr. at 250.) Westerman also testified he saw Defendant use heroin on the day of the arrest. (Tr. at 252-253.)

Salinas and Westerman testified that earlier that day they had been in Santa Fe. (Tr. at 129, 247.) Before their trip to Santa Fe, Westerman said he borrowed the vehicle they were driving that night. (Tr. at 243.) He said "I placed my gun in the center console, where I forgot that it was there. It was covered up. And later on, when we ended up going on our trip, I didn't even realize that the gun was there." (Tr. at 243.) He said no one was present when he put the gun in the console. (Tr. at 274.) He said the console was closed and neither Defendant nor Salinas knew the gun was in the car. (Tr. at 243, 276, 279; *see also* Tr. at 245.) Westerman also said he went to Santa Fe to buy Sudafed for a friend, which he said he assumed he wanted to make methamphetamine. (Tr. at 247-248.)

Salinas testified that he was searched just before being put into the police car and transported with Defendant and Westerman to the west side substation. (Tr. at 135, 136, 145.) However, Westerman said they were transported in two separate cars and first taken to the First Street substation before going to the west side substation. (Tr. at 242-243.) While in the car, Westerman said he admitted to the transport officer that everything was his, including the gun. (Tr. at 260, 262-263, 268.) He also said he admitted this to a tall white officer later at the substation who was writing

20

the report.  (Tr. at 260-261.)  He said he made the admission in the holding cell while he was handcuffed to a bar; but the officer did not write it down.  (Tr. at 261.)  He said no one asked him any follow-up questions about the gun.  (Tr. at 268.)  He also admitted he was being pretty difficult with the officers that night at the substation.  (Tr. at 258.)  He said he "laughed at them. . . [and] told them that this is– you think that you got John Gotti.  This is the biggest bust you've ever had in your life.  I've been arrested for worse stuff than this."  (Tr. at 258.)  He said he did not hear Defendant admit everything was his at the substation, and doubts he just did not hear it because they were "never separated."  (Tr. at 258.)  He estimated he was in the holding cell about 16 hours (Tr. at 269), and did not know exactly how long after he had been in the holding cell before he made the second admission, but said it was hours after they started their report.  (Tr. at 270.)

Salinas also testified that at the substation they were placed in a holding cell and handcuffed to concrete pillars.  (Tr. at 136.)  He said they stayed there for 48 hours.  (Tr. at 136, 145.)  He said he did not remember being interviewed by Officer Carrasco, or anyone else being interviewed by him.  (Tr. at 145.)  However, Salinas said "[w]e were all talking shit" and "[b]asically just saying something like– I think he [Westerman] said something like it's all mine.  Don't even worry about it."  (Tr. at 145-146.)  He said Westerman and Defendant went "back and forth like no, it's mine, it's all mine, back and forth."  (Tr. at 146.)  Salinas said he does not remember Defendant saying "the gun specifically" but remembers him saying "everything's mine."  (Tr. at 146-147.)  He said he did not make this statement to an officer, but instead "just kind of blurted it out loud."  (Tr. at 154.)  He said Westerman and Defendant said these things "[j]ust in a joking manner" and were "just being sarcastic with each other."  (Tr. at 149-150.)  Salinas said he was laughing while they were saying this because he understood they were kidding around.  (Tr. at 150-151.)

### 2.      Cecilio Diegues Testimony

Cecilio Diegues testified he was at Defendant's residence/business on the night of the incident. (Tr. at 157.)  He said he lives there in apartment #1, and is an auto mechanic for the shop, Saucedo Auto Sales, which Defendant owns.  (Tr. at 156-157.)  He said when he saw Defendant pull into the drive, he went to open the gate and see what was going on.  (Tr. at 157.)  At that time, he said he saw two to three patrol cars; and said "an officer told me to go inside; that I could not come out.  When I went to tell him that I live there, he said 'Get out. Get out. Get out.'"  (Tr. at 158.)  He said he did not have time to look whether the officer had anything in his hand because when "he put his hand to his gun" Diegues "went inside."  (Tr. at 158.)  Diegues saw one police car with emergency lights on parked on the side of the street nearest the property, and other cars across the street that looked like police cars but did not have the emergency lights engaged.  (Tr. at 161; *see also* Tr. at 178-179, 182-183.)  He said the only officer he saw was the one who told him to go inside.  (Tr. at 161.)  He further testified that he could only see the emergency lights coming from the car on the curb nearest him, and the headlights from the car facing the opposite direction across the street.  (Tr. at 161, 183.)

Diegues also testified that on the night of the incident, he left the gate unlocked because Defendant had gone out.  (Tr. at 167.)  He said the gate was open wide enough for a person to get through, but not a car.  (Tr. at 167, 172.)  He said Defendant pulled the vehicle up almost to the gate; and "[j]ust a little part of the car was sticking out."  (Tr. at 179- 180.)

### IV.  FINDINGS ON CREDIBILITY

### A.      Officer Carrasco

In this case, the government depends predominantly on the testimony of Officer Carrasco to support admission of the evidence at issue.  Officer Carrasco testified several hours over the course

of two days.  The court listened to his testimony and observed his demeanor.  As demonstrated by

the testimony restated above, Officer Carrasco is best described as a moving target.  He responded

rapid-fire to virtually every question asked.  His answers were self-serving and changed to fit the

scenario best supporting his position at the time.  For example, his description of the lighting at the

scene changed depending upon whether he was expressing concern for his safety, or his ability to see

small details on an I.D. card.  Likewise his description of his DWI experience vacillated from that of

an expert to that of an untrained rookie.  The belt tape came into existence when he needed to bolster

his testimony at the bond hearing, but magically disappeared when called upon to produce it.

Officer Carrasco also seemed well-versed in the appropriate words that typically authorize

police action, such as expressing concern for his safety.  However, his alleged actions were often

inconsistent with his statements.  Officer Carrasco's purported safety concern regarding Defendant

is not corroborated by his alleged decision to leave Defendant unattended in the car for almost 15

minutes, nor by his own statements which demonstrate an absence of real concern for his safety with

respect to Defendant.[19]  His suppression hearing testimony also contradicted his prior sworn

testimony at Defendant's state court bond hearing.  *See, e.g., Hackman v. Valley Fair*, 932 F.2d 239,

241 (3d Cir. 1991) (court should disregard witness's subsequent testimony that contradicts prior

deposition testimony).  His credibility was further undermined by his incredible description of the

evidentiary procedures he allegedly both followed and disregarded.  Each action he took he justified

as standard operating procedure– even when presented with the written procedures he clearly did not

follow.

---

[19] (*See, e.g.,* Tr. at 91 (Defendant not moving), 117 (no concern that Defendant would shoot Officer
Carrasco), 123 (Defendant not belligerent or uncooperative.))

Having observed Officer Carrasco and reviewed his testimony in painstaking detail, this court finds Officer Carrasco's testimony lacks veracity and his motivation was solely to cover his own mistakes and bolster his conduct. The dubious nature of Officer Carrasco's testimony is not limited in scope, but touches upon matters of considerable importance to the issues pending before this court, as well as matters that are only significant to the extent they reflect upon his credibility. Based upon the numerous inconsistencies in Officer Carrasco's testimony that affect matters critical to this court's determination of the issues before it, the court finds Officer Carrasco's testimony is not credible, and must be given no weight and wholly disregarded.

While the court is generally reluctant to discredit a witness's testimony in its entirety; in this case, justice requires it. This court cannot recall the last time, if ever, a witness has appeared before it who was so unabashedly inconsistent. Failing to discredit Officer Carrasco's testimony would have the effect of legitimizing this type of conduct and allowing for the admission of wholly unreliable evidence. The court is especially troubled that this conduct is that of a police officer. Officer Carrasco's testimony effectively corrupts the truth-seeking function of our trial process and cannot be condoned by this court. Therefore, after considering Officer Carrasco's testimony and determining it should be afforded no weight, the court evaluates the testimony of the other witnesses and other evidence in deciding the issues before the court.

## B.      Other Witnesses

The court finds that the testimony of Westerman and Salinas is credible, but not entirely reliable given the fact that they were both admittedly high on methamphetamine on the night at issue. The court finds the testimony credible because both Westerman and Salinas made incriminating statements, as well as statements that were not always helpful to Defendant's position. Furthermore,

24

the testimony of one corroborated that of the other on many points, despite the fact that they have

had no known recent contact with one another or Defendant.  In fact, Salinas's whereabouts were

unknown until only a few days before the suppression hearing.  (Tr. at 11 (identifying Salinas as a

previously unavailable witness); Tr. at 129 (Salinas testified the last time he saw Defendant was the

night of the arrest.))

The court finds the testimony of Diegues highly credible.  He appeared sincere and lacking

in any motivation to lie.  The court finds that a police officer saw Diegues and ordered him to go

inside.  For this reason, the court believes either Officer Hancock or Officer Carrasco spoke to

Diegues; which is a fact they both deny.  Alternatively, another police officer spoke to Diegues, which

undermines the government's argument that only Officer Carrasco and Officer Hancock were at the

scene; and bolsters Defendant's argument that several police officers were present.  In either event,

it undermines the credibility of the government's version of events.

Finally, the court finds Officer Hancock's testimony to be questionable.  Although the legality

of Westerman's search and arrest is not at issue, testimony on these issues contribute to this court's

assessment of Officer Hancock's credibility.  The court believes more force was used with Westerman

than Officer Hancock admitted using.  The court finds Westerman was removed from the vehicle

through the passenger window because this is not the type of fact that one would likely forget, nor

does it significantly aid Defendant's or Westerman's claims.  The court also believes additional

officers were present at the scene, which contradicts Officer Hancock's statement that he and Officer

Carrasco were the only officers present.  Moreover, the court does not believe that Westerman

handed Officer Hancock a fake I.D. while seated in the vehicle.  The court believes this I.D. was

likely discovered through a search of Westerman, thus also undermining Officer Hancock's testimony.

# V.  LEGAL ANALYSIS

## A.    Traffic Stop

This court conducts a dual inquiry to determine the reasonableness of an investigative detention.  First, the court examines "whether the officer's action was justified at its inception;" and second "whether it was reasonably related in scope to the circumstances which justified the interference in the first place."  *United States v. Hunnicutt*, 135 F.3d 1345, 1348 (10th Cir. 1998) (*quoting Terry v. Ohio*, 392 U.S. 1, 20, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)).  "[A] traffic stop is valid under the Fourth Amendment if the stop is based on an observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring."  *United States v. Botero-Ospina*, 71 F.3d 783, 787 (10th Cir. 1995).

In this case, both Salinas and Westerman testified that Defendant swerved while driving. Additionally, they both testified that Defendant was under the influence of drugs while driving his car, which likely impaired his ability to drive.  Failing to maintain a lane while driving is a traffic violation. Therefore, the stop was justified at its inception.  *See United States. v. Botero-Ospina*, 71 F.3d at 785, 788 (upholding stop when officer observed a car "swerve from the outside lane, straddle the center line, and swerve back to the outside lane" on a stretch of highway where drivers frequently experience fatigue).

The fact that Officer Carrasco did not issue a citation for this violation does not affect the court's analysis.  While this fact may indicate Officer Carrasco had other reasons for stopping Defendant, any such reasons are irrelevant to the inquiry of whether there was an observed traffic violation or a reasonable suspicion that a traffic violation had occurred.  *See Whren v. United States,* 517 U.S. 806, 813, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996) (motivations of officers are irrelevant for

determining Fourth Amendment reasonableness); *see also Botero-Ospina*, 71 F.3d at 787.

**B.    Further Detention and Questioning**

"During a routine traffic stop, the detaining officer may request a driver's license and other vehicle documents, run a computer check on the car and driver, and issue a citation." *United States v. Gregory*, 79 F.3d 973, 979 (10th Cir. 1996); *see also United States v. Holt*, 264 F.3d 1215, 1221 (10th Cir. 2001); *Hunnicutt*, 135 F.3d at 1349.  An officer may also run a background check to see if the driver has any outstanding warrants or criminal history.  *Holt*, 264 F.3d at 1221.  However, the investigative detention must usually "last no longer than is necessary to effectuate the purpose of the stop," and "the scope of the detention must be carefully tailored to its underlying justification." *Hunnicutt*, 135 F.3d at 1349 (quoting *Florida v. Royer*, 460 U.S. 491, 500, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983)).

In this case, the evidence shows that after stopping Defendant, Officer Carrasco requested Defendant's driver's license, registration and proof of insurance, none of which he produced. Defendant also provided Officer Carrasco with his correct name and other personal information, which the officer used to run a background check on Defendant.  The background check revealed Defendant had a valid driver's license and no outstanding warrants.  These initial questions and the background check of Defendant are justified.  *See Holt, supra; Gregory, supra.*  Moreover, there is no evidence that the time it took to ascertain this information from Defendant and run a background check was unreasonably long.

Additionally, a detention can be lengthened for further questioning in two circumstances:  1) if the officer has an objectively reasonable and articulable suspicion illegal activity has occurred or is occurring; and 2) if the initial detention has become a consensual encounter. *United States v. West,*

219 F.3d 1171 (10th Cir. 2000) (citing *United States v. Patten*, 183 F.3d 1190, 1193 (10th Cir. 1999); *Hunnicutt,* 135 F.3d at 1349 (citations omitted).  The Tenth Circuit has found that a variety of factors may contribute to the formation of an objectively reasonable suspicion of illegal activity, including: no proof of ownership of the vehicle, no proof of authority to operate the vehicle, driving with a suspended license, inconsistent statements about destination and a reluctance to stop. *Hunnicutt,* 135 F.3d at 1349 (citations omitted).

Here, the encounter was not consensual.  Defendant was not free to leave at any point, nor did he agree to answer additional questions.  Moreover, once Officer Hancock arrived, and potentially several other officers, the police presence at the scene was not indicative of a voluntary encounter.

Furthermore, although Officer Carrasco was the only officer who testified about his reasons for detaining Defendant, the court evaluates the detention objectively, by examining the totality of the circumstances, and does not make its decision based upon Officer Carrasco's subjective reasons. In this case, Defendant had no proof of ownership of the vehicle, no proof of authority to operate the vehicle, no insurance and a temporary license plate belonging to another vehicle.  Additionally, Salinas testified that Defendant appeared tired and said "by the way he was acting, [Salinas] could tell [Defendant] was high."  (Tr. at 140.)  All of these factors contribute to the formation of an objectively reasonable suspicion of illegal activity justifying the lengthening of the detention.  *Id.*

Nevertheless, even though Officer Carrasco was justified in lengthening the detention based on these facts, the scope of the detention must still "be carefully tailored to its underlying justification." *Hunnicutt*, 135 F.3d at 1349 (quoting *Royer*, 460 U.S. at 500).  Here, Officer Carrasco would have been justified in questioning Defendant further, issuing a citation or conducting a DWI investigation.  However, he did not do any of these things.  Although Officer Carrasco testified that

his focus on conducting an investigation of Defendant got away from him when he saw the passengers moving around, the court does not find this explanation credible, nor does it give it any weight. The remaining evidence shows that the scope of the detention quickly moved away from its initial justification, namely a traffic violation and possible DWI, to an all out investigation of Defendant and the passengers for evidence of other crimes. Thus the detention exceeded its lawful scope.

## C.   *Terry* Search

"A law enforcement officer may constitutionally conduct a warrantless patdown search of a person if the officer harbors an articulable and reasonable suspicion that the person is presently armed and dangerous." *United States v. Wald*, 208 F.3d 902, 906 (10th Cir. 2000) (citing *Terry*, 392 U.S. at 21, 27 and *United States v. Davis*, 94 F.3d 1465, 1468 (10th Cir. 1996)). "If the protective search goes beyond what is necessary to determine if the suspect is armed, it is no longer valid under *Terry* and its fruits will be suppressed." *Minnesota v. Dickerson*, 508 U.S. 366, 373, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993) (citation omitted). The reasonableness of a patdown is "measured in objective terms by examining the totality of the circumstances." *Holt*, 264 F.3d at 1220 (citing *Robinette*, 519 U.S. at 39). "[I]f police officers' actions exceed what is reasonably necessary under the totality of the circumstances, the stop may only be justified by probable cause or consent." *United States v. Melendez-Garcia*, 28 F.3d 1046, 1051 (10th Cir. 1994) (citing *United States v. Perdue*, 8 F.3d 1455, 1462 (10th Cir. 1993)).

In this case, an objective examination of the totality of the circumstances does not support a finding that Officer Carrasco had a reasonable articulable suspicion that Defendant was armed and dangerous to justify a patdown search. As discussed above, Officer Carrasco's testimony on this issue merits no weight. The remaining evidence is thus considered. First, Officer Hancock testified

he did not see anyone in the car doing anything suspicious (Tr. at 200), nor did he see Defendant or Salinas doing anything while he was talking to Westerman.  (Tr. at 203-204.)  He also testified he had no personal concern for his safety based on what he saw.  (Tr. at 203.)  Basically, Officer Hancock had no contact with Defendant until he was already in handcuffs, seated on the curb.  (Tr. at 194, 216.)

Second, neither Salinas nor Westerman testified that they saw Defendant moving around or acting suspiciously.  Westerman testified he saw Defendant brought out of the car and searched (Tr. 238), but gave no additional information that would give an officer a reasonable suspicion that Defendant was armed and dangerous.  In fact, Westerman's testimony that Defendant did not know the gun was in the car (Tr. at 243), supports a finding that Defendant did not make any movements towards the console to retrieve the gun, as suggested by Officer Carrasco.  Furthermore, Salinas's testimony that Defendant appeared "tired" (Tr. at 139) does not support a finding that Defendant was actively moving around in the car.

Third, the evidence shows the stop occurred late at night in a dimly lit area, illuminated predominantly by patrol car high beams and spot lights.  (Tr. at 190.)  Additionally, at the time of the stop, there were three passengers in the vehicle and only one officer– although at least one officer, and possibly several others, arrived soon thereafter.  (Tr. at 131-132, 237.)  These facts may justify Officer Carrasco ordering Defendant out of the car, *see Holt*, 264 F.3d at 1222 (officer may order driver and passengers out of car even in absence of particularized suspicion of danger); *see also United States v. Dennison,* 410 F.3d 1203, 1211 (10th Cir. 2005); however, they are not particular to Defendant and thus do not alone support a *Terry* frisk for weapons.

Finally, even if Westerman and Salinas were moving around in the vehicle, their conduct does

not transfer to Defendant and give rise to a reasonable suspicion that he is armed or dangerous. *See United States v. Maddox*, 388 F.3d 1356, 1365 (10th Cir. 2004). "[M]ere propinquity to others independently suspected of criminal activity is insufficient, standing alone, to create an articulable suspicion to support a *Terry* frisk." *Id.* (quoting *Ybarra v. Illinois*, 444 U.S. 85, 91, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979)); *see also Dennison*, 410 F.3d at 1211 (discussing *Ybarra, supra*).

Because the court finds that Officer Carrasco did not have a reasonable articulable suspicion that Defendant was armed and dangerous, he did not have a lawful basis for conducting a *Terry* frisk of Defendant. *See Wald*, 208 F.3d at 906. The patdown search of Defendant is a violation of his Fourth Amendment rights. Officer Carrasco was not in a lawful position from which to find and remove Defendant's wallet and its contents from Defendant's pocket. The false I.D. located in Defendant's wallet was the basis for Defendant's arrest for altering an identification card, and the subsequent search of Defendant and his car incident to that unlawful arrest. (Supp. Report at 2 of 4.) The evidence sought to be admitted in this case has been obtained at by exploitation of Defendant's illegal search. *See United States v. King*, 990 F.2d 1552, 1563 (10th Cir. 1993) (court must determine whether evidence was discovered as a result of the exploitation of the illegality or by means sufficiently distinguishable to purge the primary taint (citing *Wong Sun v. United States*, 371 U.S. 471, 488, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963))).

**D.     Alternative Bases for Discovery**

There is not sufficient evidence before the court that Defendant's false I.D. and other evidence discovered subsequent to his illegal search would have been discovered through another lawful means. *See Hudson v. Michigan*, 126 S.Ct. 2159, 2164-65, 165 L.Ed.2d 56 (2006); *United States v. DeLuca*, 269 F.3d 1128, 1132 (10th Cir. 2001) (If government can demonstrate inevitable

31

discovery, discovery by independent means, or attenuation, the evidence is not fruit of the poisonous tree).  The government does not argue, and the facts do not reveal, an alternate basis upon which the false I.D. and checks allegedly found in Defendant's possession would have been discovered by any means other than through the unlawful search of Defendant.

The government argues "[e]ven prior to the arrest of the Defendant in this case, a search of the center console area in the Defendant's vehicle would have been permissible pursuant to *Michigan v. Long*, 463 U.S. 1032, 1049[, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983)].  Given the aforementioned factors at play, Officer Carrasco would have been reasonable in searching the vehicle for weapons even absent the arrest of the Defendant." (Response Br. at 8 (citations omitted.))  *Long* stands for the proposition that the police can conduct a *Terry* search of a vehicle for weapons based upon reasonable articulable suspicion that a properly detained driver may be armed and dangerous, and "may gain immediate control" of a weapon located in the vehicle.  463 U.S. at 1049; *see also United States v. Palmer*, 360 F.3d 1243, 1246 (10th Cir. 2004).  As discussed above, Officer Carrasco did not have a reasonable articulable suspicion that Defendant was armed and dangerous.  Therefore, he could not lawfully conduct a *Terry* frisk of Defendant or the vehicle. *See Long, supra; Palmer, supra.*

The government also states "the 'inevitable discovery doctrine' is another alternative basis that may apply in this case." (Response Br. at 8.)  The inevitable discovery doctrine is an exception to the exclusionary rule and permits evidence to be admitted "if an independent, lawful police investigation inevitably would have discovered it."  *United States v. Cunningham*, 413 F.3d 1199, 1203 (10th Cir. 2005) (quoting *United States v. Owens*, 782 F.2d 146, 152 (10th Cir. 1986)).  However, this statement is not supported by any argument or analysis whatsoever.  (*See generally* Response Br.)  While this statement, with nothing more, is virtually the equivalent of an argument

not raised and thus waived; even if considered, the government clearly fails to carry its burden with respect to this argument. *See Cunningham*, 413 F.3d at 1203 (government has burden of proving evidence at issue would have been discovered without the Fourth Amendment violation (citation omitted)); *see also Zubia-Melendez,* 263 F.3d at 1160. In any event, the facts do not show the evidence would have been discovered without the illegal search of Defendant.

Finally, evidence obtained following a Fourth Amendment violation may be admissible if it is so attenuated from the illegality as to dissipate any taint. *See United States v. Torres-Castro*, 470 F.3d 992, 999 (10th Cir. 2006). When there has been a violation, the government bears the heavy burden of showing that the primary taint has been purged. *United States v. Fernandez*, 18 F.3d 874, 881 (10th Cir. 1994). The court examines the totality of the circumstances to determine whether there has been a break in the causal connection between the illegality and the evidence. *Gregory*, 79 F.3d at 979. In considering whether the evidence is sufficiently attenuated, the court considers: 1) the temporal proximity of the Fourth Amendment violation; 2) any intervening circumstances; and 3) the purpose and flagrancy of the official misconduct. *Torres-Castro*, 470 F.3d at 999 (citing *King*, 990 F.2d at 1563-64 and *Brown v. Illinois*, 442 U.S. 590, 603-04, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975)).

In this case, the court does not find credible Officer Carrasco's testimony that Defendant consented to the removal of his wallet; and no one else admitted hearing such a statement. Nevertheless, even if he had given consent, it occurred during, or immediately following, the illegal patdown search; therefore there is virtually no break in time between the illegality and the seizure of the wallet and its contents. Additionally, all of the testimony indicates the vehicle was searched immediately after Defendant and the passengers were handcuffed. Therefore, there was no temporal

break between the illegal patdown and search of Defendant and of the vehicle; nor does the government point to any intervening circumstances that would purge the taint of the illegal search. Furthermore, there is no evidence other than Officer Carrasco's testimony that Defendant admitted he was on heroin that night.  The court does not give this testimony any weight.  Nevertheless, even if such an admission occurred, it is alleged to have happened after Defendant was under arrest, handcuffed and seated on the curb.  There is no temporal break in the chain of illegalities that occurred, nor any intervening circumstances.  Although Officer Carrasco claims he read Defendant his *Miranda* rights prior to this alleged admission, the *Miranda* warnings, by themselves, do not break the causal connection between the illegality and the evidence obtained by exploitation of the illegal arrest for Fourth Amendment purposes.  *See United States v. Recalde*, 761 F.2d 1448, 1458 (10th Cir. 1985) (citations omitted).

Finally, the alleged substation admission occurred at least an hour after the initial stop.  The evidence shows that Defendant was at the scene approximately an hour until the vehicle was towed. It is unclear from the testimony how long after Defendant was transported to the substation, that the alleged admission occurred.  At the substation, Defendant remained handcuffed and under police control.  He was clearly not free to leave.  Defendant was in custody at the time of the alleged admission as a direct result of his illegal arrest.  The fact that the admission was allegedly volunteered does not persuade this court that it attenuated the illegality.  Furthermore, while the alleged admission occurred over an hour after the initial search, the court does not find this period of time sufficient to break the causal connection in this case; nor does the government present any evidence or argument that intervening circumstances arose rendering the alleged admission free of the taint.  *See, e.g., United States v. Maez,* 872 F.2d 1444, 1455 (10th Cir. 1989) (taint of illegal seizure not purged when

consent form signed 45 minutes later).  Finally, with respect to all of the evidence sought to be admitted by the government, this court finds that based upon the conduct of Officer Carrasco in this case, the evidence should be suppressed.  *See Brown*, 442 U.S. at 603-04.  Officer Carrasco violated Defendant's Fourth Amendment rights on the night at issue and then proceeded to compromise the integrity of the court proceedings by his testimony.  Suppression of the evidence is necessary to deter similar police conduct and to maintain the probity of the court.  Consequently, all the evidence discovered by the police following the illegal *Terry* search of Defendant, including any alleged admissions made by Defendant, shall be suppressed as "fruits of the poisonous tree."  *See Recalde*, 761 F.2d at 1457-58 (citations omitted); *see also Wong Sun*, 371 U.S. at 487-88.

**IT IS THEREFORE ORDERED THAT** Defendant Joe Cruz's Motion to Suppress [Doc. No. 28] is hereby **GRANTED.**

Dated this 13th day of March, 2007.

_____
MARTHA VAZQUEZ
UNITED STATES DISTRICT JUDGE

Attorney for Plaintiff:
David M. Walsh

Attorney for Defendant:
Judith Rosenstein